SIR WILLIAM REARDON SMITH & SONS, LTD., as Owner of the MOTOR VESSEL BRADFORD CITY, Libellant,

v.

The TUG SAN PEDRO, Her Engines, Tackle, Apparel and Furniture, Gissel & Company, BARGE 2001, Gissel & Company BARGE 1302 and J. S. Gissel & Company, Respondents,

v.

SIGNAL OIL AND GAS COMPANY, Intervenor.

No. 2182.

United States District Court
S. D. Texas,
Galveston Division.

Nov. 6, 1962.

Royston, Rayzor & Cook, Bryan F. Williams, Jr., Galveston, Tex., for libellant.

Eastham, Watson, Dale & Forney, Edward W. Watson, Galveston, Tex., for respondents.

Bracewell, Reynolds & Patterson, Harold R. DeMoss, Jr., Houston, Tex., for intervenor.

GARZA, District Judge.

This cause involves a collision in the Houston Ship Channel on the night of March 24, 1961, between the M/V BRADFORD CITY, an ocean-going merchant vessel of British registry, and a barge being towed by the tug SAN PEDRO.

The owners of the BRADFORD CITY filed a libel against the tug SAN PEDRO and Gissel & Company Barge 2001, and others, as respondents. The owners of the tug and barge, in turn, have cross-libeled the M/V BRADFORD CITY. In Admiralty 2249 filed in this Court, Signal Oil & Gas Company, which owned the cargo on the Gissel Barge No. 2001, in turn, sued the M/V BRADFORD CITY and her owners as respondents. A motion to consolidate those causes was granted, and this cause is being tried in Admiralty No. 2182 as noted above, with Sir William Reardon Smith & Sons, Ltd., as owners of the M/V BRADFORD CITY, as Libellants and Cross-Respondents, and J. S. Gissel & Company as Respondents and Cross-Libellants, and Signal Oil & Gas Company as Intervenor.

Both the owners of the M/V BRADFORD CITY and the tug SAN PEDRO and its barges are claiming that the collision in question was the result of the unseaworthiness and navigational faults

of each other. Signal Oil & Gas Company, as Intervenor, is claiming the loss of its cargo was due to the unseaworthiness and navigational faults of the M/V BRADFORD CITY. The case was tried by the Court and after three days of testimony and argument of counsel, the Court made its preliminary findings of fact.

These findings were to the effect that the Court could not accept the testimony of the witnesses in behalf of the M/V BRADFORD CITY that the SAN PEDRO changed her course from the right side of the channel and crossed over to the left and across the BRADFORD CITY'S bow; that the tug SAN PEDRO and the barges in her tow, prior to the collision in question, had been traveling on its left side of the channel, in violation of Article 25 of the Inland Rules (33 U.S.C. § 210); that at the time that the SAN PEDRO and the BRADFORD CITY could have seen each other, the BRADFORD CITY was traveling along the middle of the channel; that the BRADFORD CITY gave a one-signal blast, and received an answer of a one-signal blast from the SAN PEDRO, which acknowledged to the BRADFORD CITY that the SAN PEDRO would make a port-to-port passing; that the SAN PEDRO then realized that the wrong signal had been given, as she was on her port side of the channel, and proceeded to give a two-signal blast to which they received no reply; that the BRADFORD CITY was not keeping a proper lookout, or they would have realized that a port-to-port passing could not be made; that because of the failure of the BRADFORD CITY to keep a proper lookout, the BRADFORD CITY failed to take the necessary steps to avoid the collision; that the captain of the tug SAN PEDRO put his engine full astern and was trying to take his tow toward the edge of the channel and that this maneuver was what caused the BRADFORD CITY to think the SAN PEDRO had crossed its bow.

The Court found, generally, that the collision was the result of the SAN PEDRO violating the rules of the road and not keeping to its right, but if the BRADFORD CITY had been keeping a proper lookout it could have avoided the collision.

The Court found that both ships were seaworthy and that the collision was not the result of anything being wrong with the lights or the lack of any equipment on the part of either vessel.

The Court further found that this was a case of mutual fault.

At the conclusion of the findings of the Court as generally outlined above, the proctors for the M/V BRADFORD CITY asked the Court if the Court had given any thought to ruling on the major-minor fault of the parties. The Court at that time said that in its opinion the major fault was on the part of the tug SAN PEDRO, but that if the M/V BRADFORD CITY had been keeping a proper lookout, it could have avoided the collision.

Having made the findings as generally outlined above, the parties were asked to present briefs on the question of whether under said findings the judgment should be for one of mutual fault or on the application of the major-minor fault rule. Extensive briefs have been submitted to the Court.

Proctors for the tug SAN PEDRO and the Intervenor argue that the major-minor fault rule is not present in the instant case; that this rule being "vague and unreliable", as characterized by Gilmore and Black at page 403, the BRADFORD CITY should not be excused because it was guilty of a substantial contributory fault; and that that fault of failing to keep a proper lookout was in fact a statutory fault.

Proctors for the BRADFORD CITY argue that the sole fault for the collision was on the SAN PEDRO; that when the BRADFORD CITY received from the SAN PEDRO a signal confirming that she was on her own right hand side of the channel and in a position to pass port-to-port, the proper concern of the BRADFORD CITY narrowed to one of making

the bend at Buoy 98 and holding as much to the BRADFORD CITY'S starboard as possible to accomplish the passing as agreed; that prior to her turn, the BRADFORD CITY was holding to mid-channel which is a judicially recognized custom for ocean-going vessels in the Houston Ship Channel. (See Royal Navy of Italy v. Standard Oil Co. of New Jersey (CCA 5, 1929), 27 F.2d 331); that at the time the tug blew the two-blast signal as found by the Court, the events which followed were *in extremis* and are not to be considered in assessing fault.

After reviewing the evidence once again and the briefs of proctors, this Court has reached the conclusion that the one-blast signal of the tug SAN PEDRO, in answer to the one-signal blast of the BRADFORD CITY, excused the BRADFORD CITY from any fault of keeping a proper lookout; that it had a right to assume that a port-to-port passing could be made in safety; that after these signals were exchanged, the events that followed were *in extremis*, and the failure of the M/V BRADFORD CITY to keep a proper lookout cannot be taken into consideration as a fault in the collision.

There is no question that the major fault, as originally found by this Court, of the collision in question was the violation of the Inland Rules by the tug SAN PEDRO, and when said tug compounded its fault by agreeing to a port-to-port passing, it makes this a proper case for the application of the Major-Minor fault rule. Major fault being on the tug SAN PEDRO, the sole fault of this collision is found to be that of the tug SAN PEDRO and the barges she had in tow.

The Court is, therefore, entering as its Findings of Fact and Conclusions of Law those submitted to the Court by proctors for the M/V BRADFORD CITY by their letter of September 18, 1962.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

As a result of a collision which occurred in the Houston Ship Channel on March 24, 1961, the owners of the British Motor Vessel BRADFORD CITY filed a libel against the Tug SAN PEDRO and Gissel Barges 1302 and 2001, all owned by the Respondent, J. S. Gissel & Company. J. S. Gissel duly filed a cross-libel against the BRADFORD CITY. The Signal Oil and Gas Company, which owned certain cargo lost as a result of the collision, subsequently filed its separate libel against the BRADFORD CITY and her owners. All of the causes were consolidated for trial which was held in Houston, Texas, from August 21, through August 24, 1962.

The trial was limited to the question of liability for the collision. For purposes of brevity, the BRADFORD CITY and her owners are hereinafter designated Libellant; the tug and two barges and their owner Respondent; and the Signal Oil and Gas Company Intervenor.

The Court having heard the testimony of the witnesses and the arguments of counsel and having received the written briefs of all parties, now makes and enters its findings of fact and conclusions of law pursuant to Admiralty Rule 46½.

## FINDINGS OF FACT

1. The British Motor Vessel BRADFORD CITY owned by Libellant completed loading a full cargo of grain in Houston, Texas, on March 24, 1961, and under the advice of Captain C. W. Barfield, a licensed and commissioned Houston Ship Channel Pilot, began her outbound passage through the Houston Ship Channel shortly after 1800 hours. She is an ocean-going general cargo vessel of 7,265 gross tons, having an overall length of 443′ 02″, and a maximum beam of 56′ 06″. On the occasion in question her deep draft was 28′ 06″.

2. At approximately 2134 hours of the same day the BRADFORD CITY was in collision with the Barge Gissel 2001. The barge was in a flotilla owned by Respondent consisting of the Tug SAN PEDRO (Length 94′ 07″, Breadth 28′ 02″) which was pushing ahead in tandem, Barge Gissel 2001 (Length 258′ 00″, Breadth 50′ 00″) and the Barge Gissel 1302 (Length 230′ 00″, Breadth 40′

00″) with the 1302 as the lead barge. The flotilla was inbound to Houston.

3. The collision occurred at a point below Nun Buoy 98. This buoy marks the descending left bank of the Houston Ship Channel. It is at a point where the channel begins a slight bend to the right for an outbound vessel such as the BRADFORD CITY. Above the bend at Buoy 98, is another bend known as Red Light Bend, which is a rather sharp turn to the left for a downbound vessel. Below the bend at Buoy 98, the channel reach is straight for a mile or more.

4. The BRADFORD CITY, being fully loaded, was favoring mid-channel because of her draft. This is a customary procedure in the Houston Ship Channel and is necessary for deeply loaded ocean-going vessels in order to minimize the chance of taking suction from one of the banks with the possibility of a resulting sudden and uncontrollable sheer.

5. The BRADFORD CITY and the Tug SAN PEDRO first sighted each other while the BRADFORD CITY was in the reach of the channel between Red Light Bend and Buoy 98, and the tug and her tow were in the straight reach of the channel below Buoy 98. The evidence is uncontradicted that at this point neither vessel could tell the position of the other with respect to the sides of the channel because of the angle at which they approached one another.

6. While the vessels were thus positioned, the BRADFORD CITY sounded one blast on her whistle indicating that she wished to negotiate the customary port-to-port passing with the tug and tow. Shortly thereafter, the tug sounded a one-blast signal indicating that a port-to-port meeting was acceptable to her.

7. From the agreed passing signals, the BRADFORD CITY assumed that the tug was maintaining her own starboard side of the four hundred foot narrow channel as she was required to do under Article 25 of the Inland Rules (33 U.S.C. § 210). In fact, however, the flotilla was not proceeding on its starboard side of the channel but was coming up its own port side. The tug offered absolutely no evidence to excuse this violation of the Rules of the Road other than the fact that she had negotiated a starboard-to-starboard meeting with another outbound ocean-going vessel further down the channel. This fact is not a justification for a failure to observe the narrow channel rule but rather a verification of the fact that the tug had been violating it for some time. In fact, her Master admitted he was not aware of the rule. The weather was clear and calm and the SAN PEDRO had sufficient power to maneuver a flotilla much longer and with more dead weight than the one she had in tow on the occasion in question. It was, therefore, safe and practical for her to have maintained her own starboard side of the channel and she wholly failed to present any excuse for her failure to do so.

8. The tug and tow returned the one-blast signal of the ship because the master of the tug became confused and gave the wrong signal. The effect of his agreement to a port-to-port passing, however, was to strengthen the assumption of the BRADFORD CITY which was still above the bend, that the tug and tow were on their own proper right hand side of the channel.

9. The BRADFORD CITY began to swing to starboard to negotiate the bend at Buoy 98. Her wheel was put hard right and she proceeded around the bend at Slow Ahead, which speed had been assumed some three minutes before the collision.

10. As the BRADFORD CITY was rounding the bend at Buoy 98, the master of the Tug SAN PEDRO realized that he had made an erroneous signal in agreeing to a port-to-port passing. He thereupon signaled with two blasts, indicating that he wished to meet and pass the BRADFORD CITY starboard-to-starboard. Such a starboard-to-starboard passing would have been contrary to the usual, accepted, and in this case agreed, method of meeting and passing in the Houston

Ship Channel as prescribed by the Inland Rules (Rule 1, Article 18, 33 U.S.C. § 203).

11. Almost simultaneously with his change in signals, the master of the tug put his engines hard astern and threw the flanking rudders of the tug hard right, which had the effect of turning the tug and tow very sharply athwart the channel.

12. The BRADFORD CITY witnesses testified that the tug and tow were proceeding up their own starboard side of the channel until they suddenly turned to port across the bow of BRADFORD CITY. The Court finds that this was not the case, but that the action of the master of the SAN PEDRO in reversing his engines and throwing the flanking rudders hard over caused a sudden change in the heading of the tug and tow, which those on the bridge of BRADFORD CITY mistook for a change in her moving course.

13. The Court is of the view that if those aboard BRADFORD CITY had been more alert they might, after seeing the true position of the tug and tow, have broken their ship's swing to starboard and perhaps turned her to port, so as to have effectuated the starboard-to-starboard passing. Such a maneuver, however, would have called for exceptional perception by those on the bridge of the BRADFORD CITY in view of the fact that they could not ascertain the true position of the flotilla until they had rounded the bend at Buoy 98. Such a maneuver would have required also that the BRADFORD CITY navigate in direct contradiction to the agreed passing. Also, at the time the two-blast signal was sounded by the SAN PEDRO, and the BRADFORD CITY'S bridge was first able to realize the true position of the tug and tow, the vessels were separated by not more than two ship-lengths.

14. Under the circumstances, while the Court feels that those aboard the BRADFORD CITY should have maintained a more diligent lookout, it must be said that their fault in this respect was minor relative to the gross, deliberate and unjustified fault of the tug and tow in assuming the wrong side of the channel, and then signaling in such a manner as to cause the outbound vessel to assume that the SAN PEDRO was on her own right side of the channel.

15. The BRADFORD CITY, upon seeing the true position of the tug and tow, put her engines full astern and let go her port anchor. Simultaneously, the BRADFORD CITY sounded the danger signal indicating to the tug that a starboard-to-starboard passing could not be accomplished.

16. Despite the emergency maneuvers of both tug and ship, a collision ensued with the stem of the BRADFORD CITY striking the Barge 2001 on its starboard side. It is uncontradicted that the collision occurred on the BRADFORD CITY'S side of the channel.

17. As a result of the collision, both the motor vessel and the barge sustained substantial damage and cargo belonging to the Intervenor was lost.

## CONCLUSIONS OF LAW

1. The collision was caused by the fault of the SAN PEDRO and those in charge of her navigation in that she violated the Narrow Channel Rule (Article 25, Inland Rules, 33 U.S.C. § 210). In addition, the tug and tow failed to pass on the port side of the BRADFORD CITY as required by the Rules. (Rule 1, Article 18, 33 U.S.C. § 203). Finally, the tug compounded these faults in a most serious way by agreeing to a port-to-port passing which she was not in a position to accomplish, but which appeared feasible to those aboard the BRADFORD CITY at the time the agreement was made.

2. Those in charge of the BRADFORD CITY navigated her in accordance with the Rules, but should have been more alert so that upon discovering the true position of the tug and tow, they might have maneuvered their ship to port to accomplish a starboard-to-starboard passing. Their failure in this respect, however, is minor in view of the major

statutory faults of the SAN PEDRO. Accordingly, the BRADFORD CITY should not be held responsible for the damages to the tug and tow and should be entitled to recover her damages from the owner of the SAN PEDRO.

3. Both vessels being at fault as respects the Intervenor, it should recover its damages from Libellant and Respondent jointly and severally, but Libellant should have its recovery over against Respondent for such damages.

4. An Interlocutory Decree will be entered adjudging SAN PEDRO, her tow and Respondent to be liable in the premises.

5. The cross-libel of the Respondent will be dismissed with cost.

6. The interlocutory decree will further provide that Signal Oil and Gas Company recover its provable damages against Libellant and Respondent, jointly and severally but that Libellant shall have recovery over against Respondent for all such damages assessed against it.